UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

UNITED STATES OF AMERICA                     CRIMINAL ACTION

VERSUS                                        NO: 14-173

TERRELL WASHINGTON                            SECTION: "S" (4)

ORDER AND REASONS

**IT IS HEREBY ORDERED** that Terrell Washington's Motion to Suppress Illegally Obtained Evidence (Doc. #49) is **DENIED**.

BACKGROUND

On October 11, 2013, defendants, Terrell Washington and Jared Harris, entered the Walmart store located at 8912 Veterans Memorial Boulevard, Metairie, Louisiana. At the store's Walmart Money Center, they attempted to cash a United States Treasury check for $2,130 payable to J.S. Williamson F/B/O Parker D. Williamson, a seven-year-old boy who lives in Prattville, Alabama. Harris presented the check to the cashier. The cashier asked for identificaiton, and Harris initially refused to provide any. Eventually, Harris presented a Georgia driver's license in the name of "Johnathon S. Williamson," with Harris' photograph on it. The cashier referred to an official manual on drivers' license authenticity and consulted with another cashier who formerly lived in Georgia to determine whether the license was fraudulent. The cashier handed the license and check back to Harris. Then, Washington showed the cashier a different Georgia driver's license, and asked if she thought it was fake as well. The cashier determined that license to be fraudulent. Washington asked to speak to a manager. The cashier explained the situation to a Walmart manager, who advised

officers of the Kenner Police Department, Lieutenant Richard Mottley[1] and Officer Michael Sigur,[2] who were working a security detail at the store, about the situation.

Officer Sigur and Lieutenant Mottley walked with the manager toward the Money Center, and the manager pointed out Washington and Harris. Washington and Harris then split up and walked in opposite directions.

Lieutenant Mottley approached Washington, who caused a disturbance. Lieutenant Mottley, assisted by another Kenner police officer, restrained Washington. Lieutenant Mottley patted Washington down and found a fraudulent Georgia driver's license in the name of "Ray Robinson" that had Washington's photograph. Lieutenant Mottley also found a Georgia driver's license in the name of Terrell Washington, a United States military dependent identification card and two cards issued by an organization called "Divine Providence," all with Washington's photograph. Sometime later, a Walmart employee found a United States Treasury check made payable to "Janet Averitt" in a Coca-Cola display in the area where Washington struggled with Lieutenent Mottley.

Officer Sigur approached Harris. Harris refused to provide his identity. Officer Sigur heard what was happening with Washington, and convinced Harris to accompany him to that location, which was near Walmart's loss prevention office. Washington and Harris were formally detained. As Officer Sigur searched Harris for weapons, he felt something in Harris' pocket that was the size and shape of a driver's license. He also saw something flutter to the ground. A Walmart security

---

[1] Mottley has been promoted to the rank of Captain. For convenience, the court will refer to him as Lieutenant because it is the rank he held on the day in question.

[2] Officer Sigur has retired from the Kenner Police Department and is now a Kenner City Councilman. For convenience, the court will refer to him as Officer because it is the rank he held on the day in question.

employee pointed out that Harris had dropped something, which Harris was standing on. Officer Sigur picked up the object, and it was the United States Treasury check made payable to J.S. Williamson F/B/O Parker D. Williamson. Officer Sigur again asked Harris to identify himself, and he refused. Officer Sigur retrieved the driver's licenses from Harris' pocket and discovered one from Georgia with the name "Johnathon S. Williamson" and one from Ohio with the name "Jorge Aponte," both licenses with Harris' photograph. Officer Sigur also found in Harris' pocket an electronic key fob for a rented 2013 Nissan Maxima. Washington and Harris were arrested on the charge of disturbing the peace.

 Officer Sigur located the 2013 Nissan Maxima in the Walmart parking lot. He found Terrineka Watts sleeping in the backseat. Watts told Officer Sigur that she left Atlanta, Georgia in that vehicle with Washington and Harris, and that the group had driven through several states over the past few days, including Arkansas and Louisiana. Watts stated that she slept though most of the trip, but recalled going to a Walmart in Arkansas with Washington and Harris. Watts appeared to be intoxicated.

 Officer Sigur notified Detective Daniel Stromeyer[3] about the discovery of the vehicle. Detective Stromeyer instructed Officer Sigur to lock and secure the vehicle in anticipation of applying for a search warrant. The vehicle was towed to the Kenner Police Department complex pending the obtaining of a warrant for inspection of the vehicle. Detective Stromeyer looked in the vehicle's glove compartment to obtain registration information to complete the Kenner Police Department towing form. While looking in the glove compartment for the registration, Detective

---

[3] Detective Stromeyer has retired from the Kenner Police Department. For convenience, the court will refer to him as Detective because it is the rank he held on the day in question.

Stromeyer noticed a United States Treasury check. He immediately closed the glove compartment and applied for a search warrant.

Detective Stromeyer drafted a search warrant application for the 2013 Nissan Maxima and presented it to Patricia Joyce, Commissioner of the Twenty-Fourth Judicial District Court, Parish of Jefferson, State of Louisiana. Commissioner Joyce approved the warrant at 8:59 p.m. on October 11, 2013. Thereafter, Detective Stromeyer, along with other state and federal law enforcement personnel, searched the vehicle. They discovered Hertz Corporaiton rental documents in the name of Washington's mother, Monica Washington; 22 United States Treasury checks in the names of various individuals; 20 fraudulent driver's licenses most of which matched the names of the payees on the checks; approximately $13,160 in cash bundled around multiple receipts documenting check-cashing activities at other Walmart stores; identification card making supplies; an invoice from Idsupply.com; and, a fully loaded Jimenez 9mm semiautomatic pistol, along with 2 additional fully loaded magazines of 9mm ammunition.

On August 8, 2014, the Grand Jury in the United States District Court for the Eastern District of Louisiana returned a three-count Indictment against Washington and Harris. Count 1 of the Indictment charges Washington and Harris with conspiracy to posses with intent to use or transfer five or more false identification documents in violation of 18 U.S.C. §§ 1028(a)(3), 1028(b)(1)(B), 20128(b)(2)(B) and 1028(c)(3)(A), all in violation of 18 U.S.C. § 1028(f). Specifically, Count 1 charges that Washington and Harris conspired to use false state driver's licenses to cash multiple genuine United States Treasury checks issued to other individuals without those individuals' knowledge and consent. As overt acts, the Indictment alleges that on October 11, 2013, Washington possessed a fraudulent Georgia driver's license with his photograph and another person's name,

4

Harris possessed fraudulent Georgia and Ohio driver's licenses with his photographs and other persons' names, and the vehicle in which Washington and Harris were traveling contained approximately 20 false state driver's licenses bearing the names of other individuals, but the photographs of Washington and Harris, and 22 genuine United States Treasury checks issued and payable to individuals other than Washington and Harris. Count 2 charges Washington with a substantive count of possessing with the intent to use or unlawfully transfer five or more false identification documents on October 11, 2013, specifically, 14 fraudulent Georgia driver's licenses and 2 fraudulent Pennsylvania driver's licenses in violation of 18 U.S.C. §§ 1028(a)(3), 1028(b)(1)(B), 20128(b)(2)(A) and 1028(b)(2)(B). Count 3 charges Harris with a substantive count of possessing with the intent to use or unlawfully transfer five or more false identification documents on October 11, 2013, specifically, 7 fraudulent Georgia driver's licenses and 1 fraudulent Ohio driver's license in violation of 18 U.S.C. §§ 1028(a)(3), 1028(b)(1)(B), 20128(b)(2)(A) and 1028(b)(2)(B).

Washington filed a motion to suppress the identification card found in his wallet, the check found in the glove compartment and all evidence seized pursuant to the search warrant. He argues that the initial search and taking of the car keys was "an unreasonable warrantless search and taking of an object that had nothing to do with 'disturbing the peace[,]'" the charge for which Washington was arrested." Washington also argues that the car was unreasonably impounded by the Kenner Police Department because Watts could have moved the car. Further, Washington contends that an inventory search was conducted along with impoundment in "an attempt to circumvent the Fourth Amendment's warrant requirement by gathering evidence in a situation where the officer would not be able to obtain a warrant." Finally, Washington argues that the search warrant was obtained based

5

on the tainted evidence of the check found in the glove compartment and false statements in the warrant application consisting of a failure to mention that Watts was in the vehicle and stating that "both defendants has multiple fake IDs in their possession."

The government argues that the officers actions in searching Washington and Harris and obtaining a search warrant for the vehicle were part of the investigation related to the defendants' alleged check-cashing scheme, and were not related to the disturbing the peace charges. The government contends that the search of Washington and Harris in the Walmart was justified as a search incident to arrest. The government also argues that there was no impoundment or inventory search of the vehicle. Rather the vehicle was secured pending the issuance of a search warrant for which the officers had probable cause "that [the vehicle] was an instrumentality in [the defendants'] scheme to travel from state-to-state cashing stolen Treasury checks."

## ANALYSIS

The Fourth Amendment to the Constitution of the United States protects individuals from unreasonable searches and seizures. Although the Fourth Amendment is silent on the suppression of evidence obtained in violation thereof, the prudential "exclusionary" rule may be used to suppress evidence where doing so would "deter future Fourth Amendment violations." Davis v. United States, 131 S.Ct. 2419, 2426 (2011). "The exclusionary rule prohibits introduction at trial of evidence obtained as the result of an illegal search or seizure [and] excludes not only the illegally obtained evidence itself, but also other incriminating evidence derived from that primary evidence." United States v. Runyan, 275 F.3d 449, 466 (5th Cir. 2001) (citing Silverthorne Lumber Co. v. United States, 40 S.Ct. 182 (1920)). Further, "the exclusionary rule encompass[es] evidence that is the

indirect product or 'fruit' of the unlawful police conduct." Id. (citing Wong Sun v. United States, 83 S.Ct. 407 (1963)).

**I.     Obtaining the Keys and Searching for the Vehicle**

Washington argues that the initial search of his person and the taking of the vehicle's key fob from Harris was "an unreasonable warrantless search and taking of an object that had nothing to do with 'disturbing the peace[,]'" the charge for which Washington was arrested. He contends that these actions went beyond the scope of a search permissible under Terry v. Ohio, 88 S.Ct. 1868 (1968).

"[S]earches conducted outside the judicial process, without prior approval by a judge or magistrate, are *per se* unreasonable under the Fourth Amendment – subject only to a few specifically delineated exceptions." Mincy v. Arizona, 98 S.Ct. 2408, 2412 (1978) (quoting Katz v. United States, 88 S.Ct. 507, 514 (1967)). In Terry, 88 S.Ct. at 1884-85, the Supreme Court of the United States articulated one exception is "that where a police officer observes unusual conduct which leads him reasonably to conclude in light of his experience that criminal activity may be afoot and that the person with whom he is dealing may be armed and presently dangerous" the officer may, for his own safety and that of others in the area, "conduct a carefully limited search of the outer clothing of such persons in an attempt to discover weapons which might be used to assault him."

Another exception is that law enforcement officers "may perform searches incident to constitutionally permissible arrests in order to ensure their safety and safeguard evidence." Virginia v. Moore, 128 S.Ct. 1598, 1607 (2008). In addition to searching for weapons or instruments of escape, officer may also look for evidence on the arrestee's person in order to preserve it for trial. United States v. Finley, 477 F.3d 250, 260 (5th Cir. 2007) (citing United States v. Robinson, 94 S.Ct. 467 (1973)). The permissible scope of such a search extends to containers found on the

7

arrestee's person. Id. (citations omitted). In United States v. Castro, 596 F.2d 674, 676 (5th Cir. 1979), the United States Court of Appeals for the Fifth Circuit held that a search incident to arrest could properly include the inspection of the contents of the arrestee's wallet. Another well-established exception to the warrant requirement is the "automobile exception" which permits officers to search a vehicle if they have probable cause that the vehicle contains contraband or evidence of a crime. United States v. Ned, 637 F.3d 562, 567 (5th Cir. 2011) (citing United States v. Buchner, 7 F.3d 1149, 1154 (5th Cir. 1993)). The "automobile exception" applies to vehicles parked in places not used for residential purposes because "the vehicle is obviously readily mobile by the turn of an ignition key" and "there is a reduced expectation of privacy stemming from its use as a licensed motor vehicle subject to a range of police regulation inapplicable to a fixed dwelling." Id. (quoting California v. Carney, 105 S.Ct. 2066, 2070 (1985)).

Although Washington characterizes the search of his and Harris' pockets as one under Terry, the testimony at the hearing shows that the search was conducted incident to arrest, and was justified under the exception provided for in Virginia v. Moore, 128 S.Ct. 1598 (2008). Lieutenant Mottley testified that he searched Washington upon detention. Lieutenant Mottley discovered Washington's wallet, and he searched it to determine Washington's identity. Lieutenant Mottley discovered in the wallet a Georgia driver's license with Washington's photograph and the name "Terrell Washington"; a "Divine Providence" Post Master General identification card and driver's license both with Washington's photograph and name; a military identification card with Washington's photograph and name; and a Georgia driver's license with Washington's photograph and the name "Ray Robinson." Lieutenant Mottley testified that he did not know Washington's true identity at that point or if the identification cards and United States Treasury checks were real.

Officer Sigur testified that he searched Harris. Initially, he did a pat-down search of Harris to check for weapons. Office Sigur did not discover any weapons, but felt an object that had the size and shape of a driver's license. A Walmart security employee pointed out that Harris was standing on an object that he had dropped. Officer Sigur retrieved the object and discovered it to be the United States Treasury check made payable to "J.S. Williamson F/B/O Parker D. Williamson" with an Alabama address. Officer Sigur again asked Harris to identify himself, and he refused. At this point, Officer Sigur retrieved the two driver's licenses from Harris' pocket, and discovered that one was a Georgia driver's license with Harris' photograph and the name "Johnathan S. Williamson," and the other was an Ohio driver's license with Harris' photograph and a different name. Thereafter, Officer Sigur interviewed the Money Center cashiers and determined that Washington and Harris would be placed under arrest. He continued to search Harris and found the vehicle's key fob, which was attached by a key ring to a plastic holder that had a paper insert with numbers and information indicating that the vehicle was a white Nissan Maxima. Based on his experience, Officer Sigur surmised that the vehicle was rented. Washington and Harris were transported to lock-up at the Kenner Police Department, and Officer Sigur searched the parking lot for the vehicle.

Officer Sigur's and Lieutenant Mottley's testimony demonstrate that there was sufficient probable cause for a search incident to an arrest of Washington's wallet and Harris' pockets, and also to search for the vehicle in the parking lot. When Lieutenant Mottley searched Washington's wallet and Officer Sigur searched Harris' pockets, the officers had already been informed that Washington and Harris were the people who approached the Money Center and attempted to cash a check using fraudulent identification. The officers were investigating that incident, and were permitted to search for and safeguard evidence related thereto. Further, Officer Sigur had sufficient probable cause to

9

determine that the vehicle was an instrument of the stolen-check cashing operation. When he searched for the vehicle, Officer Sigur already knew: that Washington and Harris approached the Money Center counter in the Walmart, where Harris attempted to cash a check made out to a resident of Alabama and presented a fraudulent Georgia driver's license; Harris possessed a fraudulent Ohio driver's license with his photograph but a different name; Harris refused to identify himself, claiming that doing so might incriminate him; Harris dropped the stolen United States Treasury check that he had tried to cash and attempted to hide it under his feet; Washington had a false Georgia driver's license with his photograph and the name "Ray Robinson;" and, Washington and Harris were driving a rental car from another state. These facts provided Officer Sigur with sufficient probable cause to conclude that the vehicle was part of the defendants' alleged check-cashing scheme, and might contain more evidence of the same. Therefore, the officers had sufficient probable cause to search the wallets and pockets of both Washington and Harris to locate and secure evidence, and to search for the vehicle in the parking lot.

## II.     Impoundment and Inventory Search

Washington argues that the car was unreasonably impounded by the Kenner Police Department because Watts could have moved the car. Further, Washington contends that an inventory search was conducted along with impoundment in "an attempt to circumvent the Fourth Amendment's warrant requirement by gathering evidence in a situation where the officer would not be able to obtain a warrant." The government contends that there was no impoundment or inventory search, rather the vehicle was secured pending the issuance of a warrant.

Officer Sigur testified that he found the white Nissan Maxima with Oklahoma license plates and the engine running. He noticed a woman sleeping in the back seat, so he tapped on the window

to get her attention. The woman eventually woke up and got out of the vehicle. Officer Sigur noticed that she was unsteady and incoherent, and he thought that she might be under the influence of drugs. The woman told Officer Sigur her name, Terrineka Watts, and said that she was from Georgia and on a road trip with two friends. She indicated that they had traveled through several states, including Arkansas and Louisiana. Officer Sigur called Detective Stromeyer and told him about the vehicle and the woman. Detective Stromeyer told him to secure the vehicle, and have it towed to the Kenner Police Department complex in anticipation of obtaining a search warrant. Officer Sigur retrieved the woman's shoes from the car at her request, and then secured it, without searching it, to wait for the tow truck.

     Detective Stromeyer testified, corroborating the testimony of Officer Sigur, that on October 11, 2013, he was a detective with the Kenner Police Department, and he handled cases related to financial crimes. Lieutenant Mottley contacted him about the incident at the Walmart, and told him that there were two men attempting to cash a counterfeit or fraudulent check. Detective Stromeyer also learned that Officer Sigur found a key fob for a vehicle rented from Hertz Corporation in Harris' pocket. Officer Sigur found the vehicle running in the parking lot. The vehicle had an out-of-state license plate and there was a woman sleeping in the back seat. Officer Sigur reported that the woman said she was from Atlanta, Georgia, and was on a road trip with Washington and Harris. She did not remember much of the trip because she was on medication and sleeping, but she knew that they traveled through several states and she remembered being at a Walmart in Arkansas with Washington and Harris. Detective Stromeyer instructed Officer Sigur to secure the vehicle and call for it to be towed to the Kenner Police Department's complex in anticipation of obtaining a search warrant. He testified that the vehicle was not impounded and no inventory search was performed.

When the vehicle was at the Kenner Police Department Complex, Detective Stromeyer looked inside the glove compartment to obtain the vehicle's registration information to complete the tow slip. He saw another United States Treasury check in the glove compartment in plain view, and the registration information was underneath the check. Detective Stromeyer did not search any further, and locked the car in anticipation of obtaining the warrant.

The testimony at the hearing established that the vehicle was not impounded, but was secured to protect evidence in anticipation of obtaining a search warrant. Thus, there was no unreasonable impoundment or improper inventory search.

### III. The Search Warrant

Washington argues that the search warrant was obtained based on the tainted evidence of the check found in the glove compartment and false statements in the warrant application consisting of a failure to mention that Watts was in the vehicle and stating that "both defendants has multiple fake IDs in their possession."

Pursuant to the exclusionary rule, a court must suppress evidence that was seized on the basis of a warrant that was not supported by probable cause. United States v. Pope, 467 F.3d 912, 916 (5th Cir. 2006) (citing Mapp v. Ohio, 81 S.Ct. 1674 (1961)). The court applies a two-step test to determine whether to apply the exclusionary rule. United States v. Mays, 466 F.3d 335, 342-43 (5th Cir. 2006). First, the court asks whether the good-faith exception to the rule applies. Id. at 343. Second, if the good-faith exception does not apply, the court asks whether the warrant was supported by probable cause. Id. "If the good faith exception applies, no further analysis is conducted." United States v. Calmes, 608 Fed. Appx. 307, 308 (5th Cir. 2015). "Principles of judicial restraint and precedent dictate that, . . . [the court] should not reach the probale cause issue if . . . the good-faith

12

exception" applies. United States v. Massi, 761 F.3d 512, 525 (5th Cir. 2014) (quoting United States v. Craig, 861 F.2d 818, 820 (5th Cir. 1988)). The Supreme Court of the United States has explained that "suppression of evidence obtained pursuant to a warrant should be ordered only on a case-by-case basis and only in those unusual circumstances in which exclusion will further the purpose of the exclusionary rule." United States v. Leon, 104 S.Ct. 3405, 3418 (1984))

The good-faith exception applies, and the evidence is admissible, "if the officers obtained the evidence 'in objectively reasonable good-faith reliance upon a search warrant,' . . . 'even though the affidavit on which the warrant was based was insufficient to establish probable cause.'" Pope, 467 F.3d at 916 (quoting United States v. Satterwhite, 980 F.2d 317, 320 (5th Cir. 1992)). "The 'good faith inquiry is confined to the objectively ascertainable question whether a reasonably well-trained officer would have known that the search was illegal despite the magistrate's authorization.'" Id. (quoting Leon, 104 S.Ct. at 3420 n. 23). "The court may examine all of the circumstances surrounding the issuance of the warrant." Id. (quotation and citation omitted). The court will uphold an officer's good-faith reliance on a warrant unless one of four conditions apply:

> (1) the issuing-judge was misled by information on an affidavit that the affiant knew was false or would have known was false except for his reckless disregard of the truth; (2) the issuing-judge wholly abandoned his judicial role in such a manner that no reasonably well trained officer should rely on the warrant; (3) the underlying affidavit is bare bones (so lacking in indicia of probable cause as to render official belief in its existence entirely unreasonable); or (4) the warrant is so facially deficient . . . that the executing officers cannot reasonably presume it to be valid.

Mays, 466 F.3d at 343 (quoting United States v. Gibbs, 421 F.3d 352, 358 (5th Cir. 2005)).

Washington argues for the application of the first condition. He contends that the warrant application contained "material false statements" in that it failed to mention that Watts was in the

vehicle, and "falsely states that both defendants had multiple fake IDs in their possession." He also argues that the search warrant was obtained based on the tainted evidence of the check found in the glove compartment.

In evaluating Washington's argument, the court applies the standard articulated in Franks v. Delaware, 98 S.Ct. 2674 (1978), "'which requires a defendant to show that "(1) the allegations in a supporting affidavit were deliberate falsehoods or made with a reckless disregard for the truth, and (2) the remaining portion of the affidavit is not sufficient to support a finding of probable cause.'" Id. (quoting United States v. Brown, 298 F.3d 392, 395 (5th Cir. 2002)). "The necessary falsehood can be perpetrated by omission as well as commission, but the omission must be of information that is not only relevant, but dispositive, so that if the omitted fact were included, there would not be probable cause." United States v. Davis, 226 F.3d 346, 351 (5th Cir. 2000) (citations omitted). "The second prong is often decisive, because even if the defendant proves that a statement was deliberately false or made with reckless disregard for its truth, he would still not prevail if the remainder of the affidavit set forth sufficient facts for a finding of probable cause." Mays, 466 F.3d at 343 (citing Brown, 298 F.3d at 395).

Detective Stromeyer testified that he responded to the scene and met with Lieutenant Mottley, Officer Sigur and another officer. When he arrived, Detective Stromeyer spoke with the cashiers at the Money Center, and they informed him that two men presented a check, the cashiers requested identification, and determined that the identification produced was fake. Lieutenant Mottley gave Detective Stromeyer the identification cards he found on Washington, and Officer Sigur gave Detective Stromeyer the identification cards he found on Harris. Detective Stromeyer noticed that one of the driver's licenses had Harris' picture on it and a name similar to the one on the

check that he attempted to cash. Officer Rickey transported Washington and Harris to lockup at the Kenner Police Department, and Detective Stromeyer gave Officer Rickey Washington's wallet as property to inventory.

      Detective Stromeyer testified that he continued to investigate Washington and Harris' attempt to negotiate the check, not disturbing the peace. Detective Stromeyer consulted a federal government website to authenticate the check and determined that the check was a real United States Treasury check. He consulted databases to locate the person to whom the check was made payable and contacted that person. He discovered that the check belonged to a family in Alabama for the benefit of a seven-year-old boy, and the family had not given anybody permission to cash the check. They were expecting the check, but never received it. Detective Stromeyer notified the United States Secret Service because a United States Treasury check was involved, and Secret Service agents assisted in the investigation. Officer Sigur called Detective Stromeyer and informed him that another check was found in an area in the Walmart where Washington and Harris had been.

      Detective Stromeyer testified that he had probable cause to support a warrant to search the vehicle. He drafted the affidavit in support of the warrant and took it to Commissioner Joyce's office. Detective Stromeyer testified that the affidavit was based on the aggregate of all the information he had obtained in the course of the investigation. He did not include "every little piece of information," but sufficient information to establish probable cause. Detective Stromeyer testified that he was not relying on disturbing the peace for the search warrant. It was based on the Louisiana state statutes of theft and identify theft.

      The affidavit in support of the search warrant, which was written and signed by Detective Stromeyer, stated:

On October 11, 2013, at approximately 1630 hours, this detective was summoned to the Wal Mart Store located at 8912 Veterans Boulevard in reference to two black males attempting to cash a US Treasury check with using fraudulent identification.

The casher, a black male, later identified as Jared Harris, 02-09-1991, presented the check for cashing and was accompanied by a black male later identified as Terrell Washington, 5/29/1989. Harris presented the check, in the amount of $2,130.00 and initially refused to provide identification when asked. Harris eventually displayed a Georgia driver's license number 046712932 bearing his photograph and the name of Johnathan Williamson. The cashier checked the driver's license against a book containing images of authentic driver's licenses and determined that the license was likely a forgery. The two males then proceeded towards the exits of the store.

A Kenner Police officer working a detail at the store detained the two for questioning and the two resisted with loud verbal words causing a crowd to gather. Due to the disturbance, the two were arrested and escorted to the security room. Harris denied having any knowledge of being at the check cashing kiosk advising that he only came [in to] purchase a drink, however, it was learned that he had dropped the check to the floor and was standing on it in an attempt to avoid its discovery. A search, incident to arrest, in an effort to identify the two, revealed that each of them possessed several driver's licenses bearing [their] photographs and each having different names, addresses and dates of birth.

This detective arrived and took possession of the check. Observing the check, this detective learned that it was a United States Treasury Social Security check made payable to J S Williamson, for Parker D. Williamson, 103 Dale Drive, Prattville, AL 36067. the check was payable in the amount of $2,130.00. This detective researched the check and learned that the check number had been issued in the amount stated.

Research revealed that Harris and Washington were from Georgia.

This detective contacted the Williamson residence telephonically and spoke with a female who identified herself as Mrs. Williams. Mrs. Williamson advised that Parker Williamson is her seven year old son. She applied for social security benefits on his

>behalf in March, 2013 and has not received any checks as of yet. She advised that she had been expecting a recent payment.
>
>Officer Mike Sigur located a vehicle in the parking lot of the store that was being operated by Washington and Harris. This detective secured the vehicle and had it towed to the Kenner Police complex. While completing a department tow slip, documenting the tow, this detective looked into the glove box in an attempt to locate the vehicle registration. Within the glove box, this detective observed a piece of paper that appeared to be another US Treasury check.
>
>Based on the above facts, this detective believes that the subjects may be traveling state to state in an effort to cash stolen checks. This detective requests a search of the above listed vehicle in an effort to find cash, additional checks, maps (paper or digital,) receipts, identification cards, driver's licenses and any other items that may be evidence of identity theft and/or related crimes.

Detective Stromeyer's testimony demonstrates that Washington has not met his burden to show that the allegations in the affidavit supporting the search warrant were deliberate falsehoods or made with reckless disregard for the truth. Decteive Stromeyer's omission of Watts' presence in the vehicle was immaterial to the facts supporting probable cause. Further, the statement that "each of them possessed several driver's licenses bearing [their] photographs and each having different names, addresses and dates of birth" was not deliberately false. Detective Stromeyer testified that he had information that both Washington and Harris had multiple identification cards in their possession.

Further, even without the mention of the check that Detective Stromeyer saw in the glove compartment, there is sufficient probable cause stated in the affidavit to support the issuance of a search warrant. Probable cause for the issuance of a search warrant "is deemed to exist where the facts and circumstances within the affiant's knowledge, and of which he has reasonable trustworthy information, are sufficient unto themselves to warrant a man of reasonable caution to believe that

an offense has been or is being committed." United States v. Melancon, 462 F.2d 82, 89 (5th Cir. (1972) (quotations omitted). The affidavit explains the information Detective Stromeyer obtained from the Money Center cashiers, Lieutenant Mottley and Officer Sigur regarding the events surrounding the check-cashing incident at the Walmart and the discovery of the stolen check made payable to JS Williamson F/B/O Parker D. Williamson.  Specifically, it explains that Harris presented the check to the cashiers, initially refused to provide identification, and eventually provided identification that the cashiers determined was false.  It also explains that the officers found multiple identification cards on Washington and Harris.  Further, the affidavit explains how Detective Stromeyer determined that the check was authentic and belonged to residents of Alabama, and that Washington and Harris were from Georgia and trying to cash that check in Louisiana. These facts are sufficient for Detective Stromeyer to believe that Washington and Harris were "traveling state to state in an effort to cash stolen checks." Therefore, the affidavit did not include any deliberate falsehoods and contained sufficient probable cause for the issuance of the search warrant, and the evidence obtained from the search of the vehicle is admissible.

## CONCLUSION

**IT IS HEREBY ORDERED** that Terrell Washington's Motion to Suppress Illegally Obtained Evidence (Doc. #49) is **DENIED**.

New Orleans, Louisiana, this __10th__ day of November, 2015.

**MARY ANN VIAL LEMMON**
**UNITED STATES DISTRICT JUDGE**